1

2

3

4                    **UNITED STATES DISTRICT COURT**

5                         **DISTRICT OF NEVADA**

6

7    SHARI R. TAYLOR,                    )
                                         )
8              Plaintiff,                )
                                         )
9         vs.                            )        2:07-cr-01602-RCJ-GWF
                                         )
10   FAIRFIELD RESORTS, INC./WYNDHAM et  )
     al.,                                )           **ORDER**
11                                       )
               Defendants.               )
12   _____)

13

14         This Title VII case arises out of alleged race and gender discrimination and subsequent

15   retaliation.  On December 12, 2007, Plaintiffs Shari R. Taylor and Julianne Batiste sued Fairfield

16   Resorts, Inc./Wyndham ("Fairfield"), Scott Dowling, Robert Weaks, Terri Barajas, Steve Thomas,

17   and Diane Howell in this Court on three causes of action under Title VII of the Civil Rights Act of

18   1964. (#5).  Pending before the Court is Defendant's Motion for Summary Judgment (#107).

19   Plaintiff has filed a Response (#118) and Supplemental Affidavit (#120).  The Supplemental

20   Affidavit (#120) consists of two affidavits already attached to the Response (#118).  Defendant has

21   not filed a reply.  For the reasons given herein, the Court grants the Motion for Summary Judgment

22   (#107) as to the retaliation and hostile work environment claims and denies the Motion as to the race

23   and gender discrimination claims.

24   **I.     FACTS AND PROCEDURAL HISTORY**

25         Fairfield hired Taylor as a timeshare sales representative in August 2005. (#77 ¶ 4).  In April

2006, Fairfield transferred her to the Training Department. (*Id.*). It was allegedly company policy to promote telemarketers from the Training Department to the Referral Department upon the completion of certain performance requirements. (*Id.*). Taylor alleges that although she met these requirements in May 2006, she was not promoted to the Referral Department, while a Caucasian-American male who did not meet the requirements was promoted. (*Id.*). Based on this, Taylor filed a complaint with the Nevada Equal Rights Commission ("NERC") on July 24, 2006. (*Id.*). Taylor claims that she was immediately placed on suspension in retaliation for her complaint to the NERC. (*Id.*). Once her suspension was lifted, Fairfield placed Taylor in the Referral Department, but, according to Taylor, Fairfield further retaliated against her by both failing to provide her the training necessary to her professional success and creating a hostile work environment, causing Taylor to resign. (*Id.* at ¶¶ 5–6). Taylor claims this was a "constructive discharge" in retaliation for her NERC complaint. (*Id.* at ¶ 6). Taylor then received a Dismissal and Notice to Sue from the NERC, dated August 29, 2007. (*Id.* ¶ 8). The AC also lists facts surrounding former Plaintiff Batiste's similar alleged experiences, but because she has been dismissed with prejudice as a plaintiff in this case, the Court need not address this portion of the AC.

On August 26, 2008, the Clerk entered a Notice of Intention to Dismiss Defendant Dowling pursuant to Federal Rule of Civil Procedure 4(m). (#27). The deadline to respond terminated without cure. Dowling has therefore been dismissed as a Defendant. On January 6, 2009, the Court granted the parties' stipulated request to dismiss Defendants Weeks, Barajas, Thomas, and Howell from the action with prejudice. (#50). On June 18, 2009, the Court granted the parties' stipulated request to dismiss Plaintiff Batiste with prejudice. (#101). Only Plaintiff Taylor and Defendant Fairfield remain. Defendant filed the present Motion for Summary Judgment (#107).

## II.   LEGAL STANDARDS

### A.   Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24 (1986).

In a summary judgment posture, the Court must consider the parties' respective burdens. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve

1  the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

2  *Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid

3  summary judgment by relying solely on conclusory allegations that are unsupported by factual data.

4  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the

5  assertions and allegations of the pleadings and set forth specific facts by producing competent

6  evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S.

7  at 324.

8         When considering a summary judgment motion, the Court examines the pleadings,

9  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

10  Fed. R. Civ. P. 56(c).  At summary judgment, the judge's function is not to weigh the evidence and

11  determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477

12  U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to

13  be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable

14  or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

15      **B.**    **Subject Matter Jurisdiction**

16         Federal courts are of limited jurisdiction, possessing only those powers granted by the

17  Constitution or statute. *See United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008) (citations

18  omitted).  The party asserting federal jurisdiction bears the burden of overcoming the presumption

19  against it. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Federal Rule of

20  Civil Procedure 12(b)(1) provides an affirmative defense via a motion to dismiss for lack of subject

21  matter jurisdiction. Fed. R. Civ. P. 12(b)(1).  Additionally, a court may raise the question of subject

22  matter jurisdiction, *sua sponte*, at any time during pendency of the action. *United States v. Moreno-*

23  *Morillo*, 334 F.3d 819, 830 (9th Cir. 2003).  "[W]hen a federal court concludes that it lacks subject-

24  matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y&H Corp.*, 546

25  U.S. 500, 514 (2006) (citing 16 J. Moore et al., Moore's Federal Practice § 106.66[1], pp. 106-88

1  to 106-89 (3d ed. 2005)).  A district court's dismissal for lack of subject matter jurisdiction is

2  reviewed de novo. *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000).

3  **III.    ANALYSIS**

4        **A.    Subject Matter Jurisdiction**

5        Although Defendant has concentrated on the merits of Plaintiff's claim and has not argued

6  lack of subject matter jurisdiction, the issue must be addressed in the present case, because Plaintiff

7  nowhere in the AC or the original Complaint identifies the basis of the Court's jurisdiction over her

8  Title VII claims, and a court must dismiss a case *sua sponte* where it does not have jurisdiction to

9  decide the merits.  Plaintiff filed her complaint with the NERC, but she apparently never filed any

10 claim directly with the Equal Employment Opportunity Commission ("EEOC").  As explained

11 below, without more, this fact pattern would normally result in a lack of federal subject matter

12 jurisdiction over a Title VII claim.  However, in the present case, there is jurisdiction over the Title

13 VII claim because of the worksharing agreement between the NERC and the EEOC.

14       Title VII of the Civil Rights Act of 1964 limits the jurisdiction of federal courts to those

15 claims that the EEOC has had an opportunity to examine.  The scope of federal jurisdiction over a

16 complaint under Title VII is coextensive with the claims administratively exhausted with the EEOC,

17 including claims actually adjudicated by the EEOC and claims filed with the EEOC but which the

18 EEOC fails to adjudicate or investigate:

19       To establish subject matter jurisdiction over his Title VII retaliation claim, [the
         plaintiff] must have exhausted his administrative remedies by filing a timely charge
20       with the EEOC.  This affords the agency an opportunity to investigate the charge.
         Subject matter jurisdiction extends to all claims of discrimination that fall within the
21       scope of the EEOC's actual investigation or an EEOC investigation that could
         reasonably be expected to grow out of the charge.

22 *Vasquez v. County of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003) (citing 42 U.S.C. § 2000e-5(b);

23 *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099–1100 (9th Cir. 2002)) (footnotes omitted).  The

24 Ninth Circuit has explained that when a plaintiff chooses to first file his or her complaint with the

25

1  appropriate state agency, it extends the time limit for filing the complaint with the EEOC from 180

2  days to 300 days:

3          Discrimination claims under Title VII ordinarily must be filed with the EEOC
        within 180 days of the date on which the alleged discriminatory practice occurred.
4       42 U.S.C. § 2000e-5(e)(1).  However, if the claimant first "institutes proceedings"
        with a state agency that enforces its own discrimination laws—a so-called "deferral"
5       state—then the period for filing claims with the EEOC is extended to 300 days. *Id.*;
        *see* 29 U.S.C. § 626(d)(2).  Charging parties have the benefit of the 300-day time
6       limit for filing their federal claims even when they have missed the state's filing
        deadline for submitting those claims to the state deferral agency. *See EEOC v.*
7       *Commercial Office Prods. Co.*, 486 U.S. 107, 123, 108 S.Ct. 1666, 100 L.Ed.2d 96
        (1988) (holding that state time limits for filing discrimination claims do not
8       determine the applicable federal time limit).  As Nevada is a deferral state and
        [plaintiff] first instituted proceedings with its antidiscrimination agency, the district
9       court wrongly concluded that her filing deadline was only 180 days.

10 *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1174 (9th Cir. 1999) (footnotes omitted).

11 In cases like *Laquaglia*, where a complainant files a complaint with both the state agency and the

12 EEOC simultaneously, the EEOC complaint will be deemed to have been "constructively filed" for

13 the purposes of exhaustion and limitations periods upon the sooner of: (1) sixty (60) days after the

14 complaint is filed with the appropriate state agency, or (2) the date on which the appropriate state

15 agency terminates its proceedings. *See id.* at 1174–75 (citing 42 U.S.C. § 2000e-5(c)).

16      When the provisions of the statute are construed together, this means that a Nevada plaintiff

17 who files a complaint simultaneously with both the NERC and the EEOC must file the complaint

18 with the NERC "within 240 days of the alleged discrimination to ensure timely filing with the

19 EEOC, or the [NERC] must have terminated its proceedings before expiration of the 300-day

20 period." *Id.* at 1174.  This gives state and local agencies the ability to consider complaints before

21 needlessly invoking federal jurisdiction, but it is not a substitute for EEOC review—a plaintiff must

22 still file with the EEOC at some point (and in compliance with any relevant statutory limitations

23 periods) in order to invoke federal jurisdiction. *Porter v. California Dep't of Corrections*, 419 F.3d

24 885, 891 (9th Cir. 2005) ("[A]n employee . . . who initially files a charge of discrimination with a

25 state agency in a state like California, *must* file a charge with the EEOC within 300 days of the

1    alleged unlawful employment practice in order to preserve the claim for a subsequent civil action

2    under 42 U.S.C. § 2000e-5(e)(1)." (emphasis added)) (citing *Nat'l R.R. Passenger Corp. v. Morgan*,

3    536 U.S. 101, 109 (2002)).  The *Morgan* Court was adamant that filing a charge with the EEOC was

4    mandatory. *See Morgan*, 536 U.S. at 109.  However, a claim filed only with a state agency is also

5    deemed to have been immediately filed with the EEOC if the state agency receiving the filing has

6    a worksharing agreement with the EEOC under which the state agency is an agent of the EEOC for

7    the purpose of receiving charges. *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d

8    1472, 1476 (9th Cir. 1989).  NERC is such an agent. 29 C.F.R. § 1601.74(a) (listing NERC's

9    predecessor, the Nevada Commission on Equal Rights of Citizens).

10        Although failure to exhaust administrative remedies under Title VII is a jurisdictional bar

11    to suit in federal court, untimeliness in filing with the EEOC is not a jurisdictional defect, but is

12    subject to the doctrines of waiver, estoppel and equitable tolling, as is a statute of limitations. *Zipes*

13    *v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).  This is because the statutory time limits

14    for filing a complaint with the EEOC are found in a different subsection of the statute than the grant

15    of jurisdiction. *Id.* at 393–94.  The Ninth Circuit has applied the same "separate provisions" logic

16    in concluding that failure to receive a right-to-sue letter is not a jurisdictional defect where a

17    complaint has been filed and the claimant is entitled to such a letter. *Surell v. Cal. Water Serv. Co.*,

18    518 F.3d 1097, 1104 (9th Cir. 2008).  In summary, failure to file any EEOC complaint at all is a

19    jurisdictional defect to a Title VII claim in federal court, but a district court may consider waiver,

20    estoppel, and equitable tolling where an EEOC complaint is simply untimely filed or where the

21    EEOC has not issued a right-to-sue letter where a claimant is entitled to one.

22        Here, Plaintiff has attached to the AC a copy of a July 12, 2007 letter from the NERC,

23    notifying her that her case had been closed after NERC's initial determination that her complaint

24    could not be substantiated and her failure to seek reconsideration within fifteen days. (#77, Ex. A).

25    The letter went on to inform Plaintiff that she could seek a "substantial weight review" of NERC's

findings with the Los Angeles District Office of the EEOC within fifteen days of the letter. (*Id.*). The letter noted that NERC's findings did not prevent Plaintiff from "filing a lawsuit in state court pursuant to Nevada Revised Statutes (NRS) 613.420." (*Id.*).  Section 613.420 permits suit in the Nevada district court when NERC concludes that there has been no unfair employment practice in relation to a complaint. Nev. Rev. Stat. § 613.420.  Plaintiff does not claim that she ever filed a complaint with the EEOC.  She claims only that she received a "Dismissal and Notice to Sue from the NERC." (#77 ¶ 8).  However, copies of her complaints to the NERC, provided by Defendant in the present Motion (#107), indicate that her complaints were also presented to the EEOC on August 10 and September 20, 2006. (*Id.*, Exs. M, P).  And, as noted above, filing with the NERC constitutes filing with the EEOC.  Therefore, the complaints here were deemed filed with the EEOC when filed with the NERC, *Green*, 883 F.2d at 1476, and the Court has jurisdiction over the Title VII claims.

## B.    The Merits

Plaintiff claims it was company policy to promote telemarketers from the Training Department to the Referral Department upon the completion of certain performance requirements: "ma[king] thirty-six sales within a period of three consecutive weeks that retained a seventy to eighty per cent (70-80%) closing ratio." (#77 ¶ 4).  Taylor alleges that although she met these requirements in May 2006, she was not promoted to the Referral Department, while an unidentified Caucasian-American male who did not meet these requirements was promoted. (*Id.*).  Based on this, Taylor filed a complaint with the NERC on July 24, 2006. (*Id.*).  Taylor claims that she was immediately placed on suspension in retaliation for her complaint to the NERC. (*Id.*).  Once her suspension was lifted, Fairfield placed Taylor in the Referral Department, but, according to Taylor, Fairfield further retaliated against her by both failing to provide her the training necessary to her professional success and creating a hostile work environment, causing Taylor to resign. (*Id.* at ¶¶ 5–6).  Taylor argues this was a "constructive discharge" in retaliation for her NERC complaint. (*Id.* at ¶ 6).

As to the disparate treatment claim, Defendant argues that Plaintiff did not meet the requirement for a transfer, that her poor sales performance and attendance is documented, and that an African-American female who did meet the relevant criteria was transferred by Taylor's same supervisor within months of when Taylor claims she should have been transferred. As to the retaliation claim, Defendant argues that Plaintiff cannot possibly establish a causal connection between her protected activity (her complaint to the NERC) and her suspension, because the suspension pre-dated Defendant's knowledge of Plaintiff's protected activity.

As to Taylor's performance and conduct, Defendant claims that on April 1, 2006, two months after she began working for Defendant, Plaintiff received a Warning/Counseling Notice for having been absent unexcused five times and late once. (# 107, Ex. D). Defendant appears to agree with Plaintiff that to be transferred from the Training Department to the Referral Department required thirty-six sales over a three week period,[1] with 70-80% of the sales closed without anyone's assistance, although this requirement was apparently not documented. (Taylor Dep. 73:14–76:8, Apr. 30, 2009). However, Defendant claims that the greatest number of prorated sales in any three-week period attained by Taylor was thirty-five. (Taylor Dep. 101:15, 21–23; #107, Ex. E). Defendant provides evidence that Taylor was counseled for lack of consistency and low sales numbers on July 5, 2006, (#107, Ex. G), and that Taylor was warned in writing on July 9, 2006 that she would be suspended pending further action if she did not achieve twelve deals per week for the last two weeks of her ninety-day probationary period, which were July 9–13 and July 16–20. (#107, Ex. H).[2] Taylor received another warning on July 19, 2006 for being thirty minutes late to a sales

---

[1]This amount was to be prorated to account for work days that were unavailable due to holidays.

[2]This seems to indicate that the "promotion" Taylor claims she was denied was in reality not a promotion, but a successful completion of a ninety-day probationary period. For the purposes of a Title VII discrimination claim, however, such a transfer is in substance a promotion—it is an action favorable to one's status within the organization.

meeting and fifteen minutes late to another meeting. (#107, Ex. I).  On August 15, 2006, Taylor received a Notice of Corrective Action due to poor sales, indicating that she would have to increase her sales to twelve per week for the next two weeks to avoid disciplinary action. (#107, Ex. J). Finally, Defendant claims that on August 17, 2006, Fairfield learned that Taylor had approached another employee, Tausha Prince, about copying sales data to a disc, which would be considered theft of company information. (Taylor Dep. 83:16–23, 84:5–9; #107, Exs. B, K, L).  Fairfield suspended Taylor due to this but reinstated her later when it could not complete its investigation. (Taylor Dep. 86:7–11; #107, Ex. K).

As to treatment of other employees, Defendant claims that the Caucasian-American male transferred to the Referral Department in July 2006 was Gary Jones, who had closed twenty-nine deals during the twelve work days available over the previous three-week period, which was equivalent to thirty-six deals over fifteen days when prorated, and that he closed 90% of his deals without assistance. (#107, Ex. F).[3]  Also, on March 5, 2006, Fairfield transferred an African-American female, Yvonne Hutchison, from the Training Department to the Referral Department. (#107, Ex. C).

The notice of charge from the EEOC mailed to Defendant is dated August 18, 2006, the day after Taylor was suspended. (#107, Ex. M).  Plaintiff admits having no evidence that Fairfield was aware of her complaint to the EEOC prior to this date. (Taylor Dep. 134:2–6).  Upon returning to work, Taylor was placed in the Referral Department because the Training Department had been disbanded for unrelated reasons, where she was to sell the same kinds of vacation packages she had been selling in the Training Department. (Taylor Dep. 93:20–25, 97:19–22).

Taylor resigned on September 28, 2006, four days after returning to work. (Taylor Dep. 103:7–17).  She then filed an amended charge and second amended charge with the EEOC claiming

[3]This is equivalent to 36.25 deals over 15 work days.

race and gender discrimination and retaliation. (#107, Exs. P, Q).  On August 27, 2007, NERC

closed Taylor's charge. (#107, Ex. S).

### 1.    Race and Gender Discrimination

The Ninth Circuit recently laid out the framework for examining a Title VII

discrimination claim at the summary judgment stage:

> The Supreme Court's landmark case regarding employment discrimination claims brought under Title VII, *McDonnell Douglas v. Green*, sets forth a proof framework with two distinct components: (1) how a plaintiff may establish a prima facie case of discrimination absent direct evidence, and (2) a burden-shifting regime once the prima facie case has been established. 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  In the summary judgment context, the plaintiff bears the initial burden to establish a prima facie case of disparate treatment. *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000). If the plaintiff succeeds in showing a prima facie case, the burden then shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for its employment decision. *Id.* at 1123–24. Should the defendant carry its burden, the burden then shifts back to the plaintiff to raise a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination. *Id.* at 1124. The central dispute in this case is whether Noyes' evidence was sufficient to raise a triable issue of fact as to pretext.

*Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007).

To make out a prima facie case in the failure to promote context, the Ninth Circuit "requires

the employee to show: '(1) she belongs to a protected class, (2) she was performing according to her

employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other

employees with qualifications similar to her own were treated more favorably.'" *Id.* (quoting

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).  Here, Plaintiff is an African-

American female who claims she met the performance requirements and was not promoted, while

an employee of a different race and gender who did not meet the requirements was promoted. (#77

¶ 4).  Although conclusory, this is enough to make out a prima facie case.  If true, this would

constitute a prima facie claim of discrimination under Title VII sufficient for a jury to infer

discriminatory intent.    The burden therefore shifts to Defendant to show a "legitimate,

nondiscriminatory reason" for its decision. *Chuang*, 225 F.3d at 1123–24.

Defendant has provided evidence showing a legitimate, nondiscriminatory reason for not promoting Taylor. Fairfield has provided Taylor's own testimony that, in spite of her conclusory allegation in the AC that she met the requirements for promotion, she never exceeded thirty-five sales in any three-week period. (Taylor Dep. 101:15, 21–23; #107, Ex. E). Furthermore, Exhibit E shows that the thirty-five sales was not Taylor's consistent sales level, and that Taylor did not often excel. Defendant has also adduced evidence indicating that Taylor was repeatedly counseled for poor performance, both in her sales numbers, and even in her work attendance. Finally, Defendant has adduced evidence that an African-American woman was promoted in March 2006 and that the Caucasian-American man who was promoted in July 2006 had attained a pro-rated sales total of over thirty-six sales in a three-week period. Defendant has carried its shifted burden of demonstrating a legitimate, nondiscriminatory reason for its decision not to promote Taylor. The burden therefore shifts back to Plaintiff to show "a triable issue of fact that the defendant's proffered reason was a pretext for unlawful discrimination." *Chuang*, 225 F.3d at 1124. Taylor may show pretext either directly, by showing that unlawful discrimination likely motivated the employer, or indirectly, by showing that the employer's explanation is not believable. *Noyes*, 488 F.3d at 1170. If the evidence of pretext is circumstantial, Taylor must produce "specific" and "substantial" facts. *Id.* (quoting *Godwin*, 150 F.3d at 1222). All the evidence produced, of either type, is considered cumulatively. *Raad v. Fairbanks-Northstar Borough Sch. Dist.*, 323 F.3d 1185, 1194 (9th Cir. 2003).

Plaintiff has met her shifted burden. Although her own claims and argumentation do not meet the burden alone, the evidence attached to her Response (#118) does. Plaintiff admits in her Response (#118) not having made thirty-six sales in any three-week period in June 2006, but she denies that she never made more than twenty-six. (#118, ¶4). She never claims or provides evidence that she made thirty-six sales, prorated for unavailable work days, in any three-week period during her employ. Nor does she address the evidence that an African-American woman was promoted in March 2006 and that the Caucasian-American man who was promoted in July 2006 had attained a

pro-rated sales total of over thirty-six sales in a three-week period. She claims that Defendant has

been unresponsive to her discovery requests in providing information concerning her sales record.[4]

Plaintiff bases her discrimination claim on the fact that she made more sales over a three week period than Gary Jones. Jones made twenty-nine sales over a three-week period that included only twelve available working days, for a prorated sales total of 36.25. Plaintiff claimed in her deposition that she once made thirty-five deals over three weeks. Neither employee made thirty six sales over a three week period, but the three-week period over which Taylor made her thirty-five sales was not the same three-week period over which Jones made his twenty-nine sales. Jones only had twelve working days to make those sales. As far as the Court can tell from the evidence, Taylor had a full fifteen working days to make her sales, which is the normal amount of working days in a three week period. This therefore represents a lower amount of sales per working day over the relevant three-week period. Fairfield's policy reflects a concern about consistency of sales over time, and the fact that its policy accounted for short work weeks indicates a good faith attempt to be fair. Taylor had a right to equal treatment under the policy Fairfield chose, but she did not have the right to set the policy. Taylor's own declarations do not meet her shifted burden.

However, the evidence attached to her Response (#118) satisfies her burden. Taylor's evidence establishes a genuine issue of material fact over whether African-American and/or female employees were given older sales leads with which to work when in the Training Department than their Caucasian-American and/or male coworkers were given, making it substantially more difficult to make the required thirty-six sales over a three-week period.

First, the deposition of Rochel Collins includes the following exchange indicating that Collins witnessed race and gender discrimination against Taylor and others:

---

[4]The sales charts provided by Defendant begin on June 4, 2006. If Plaintiff's thirty-five sales made during a three-week period in May included a week where there was an unavailable work day, she would perhaps be able to show a triable issue of fact concerning discrimination. However, she has neither claimed nor provided evidence for this.

1    Q     During your tenure at Fairfield did you observe discrimination based on sex,
           meaning gender, or Shari Renee Taylor?

2

3    A     Yes.

     Mr. Rempfer:  Objection.  Vague.
4

5          . . . .

6    A     Because I saw that your leads were like way, way older than ours, but you
           were expected to produce at even a higher level than we were, which I
7          couldn't understand how you could produce an antiquated lead at a greater
           rate than a more recent client connection. . . .

8          . . . .

9          . . . I noticed they did that to a lot of females, black females, in your group of
           females.  It was such a higher expectation of antiquated leads.
10

11   Q     Did you observe discrimination based on race, on Shari R. Taylor in regards
           to continued telemarketing?

12   Mr. Rempfer:  Objection.  Legal conclusion.

13         . . . .

14   A     I would say yes, because there wasn't that many black females.  Even the
           ones that came in, they were watched with like – real quick, until they had
15         maybe just you and maybe the other ones and that was it.

16   (Collins Dep. 14:4 –15:13 Aug. 20, 2009).  Collins's bare comparisons of her leads to Taylor's are

17   not relevant to a claim of race discrimination without more, because Collins worked in the Referral

18   Department, while Taylor worked in the Training Department, where everyone's leads were worse.

19   Also, Collins's race is not clear from her testimony.  The fact she is a female and had much better

20   leads than Taylor does not show there was gender discrimination here.  If she is also African-

21   American, this would also tend to negate an inference of race discrimination based on the difference

22   between the quality of Taylor's leads and Collins's.  However, in the exchange above, Collins

23   appears to be comparing Taylor's and other black females' leads to other employee's leads within

24   the Training Department.  She could also have wrongly inferred discrimination because her friends

25   in the Training Department all happened to have poor leads, but only because they were in the

Training Department, not because of their race or gender.  The above exchange supports an

inference of discrimination, but does not require it.  Later in the deposition, Collins testified as

follows:

> Q     So you don't know how many people were in the Training Department?
>
> A     I know what I told you, and I can't be more specific than that.  I never broke
>         it down.
>
> Q     Let's make it clear.  You are accusing a lot of people.
>
> A     I an telling you what I saw.  I am telling you I saw a lot of different leads
>         going to different people.  I saw the leads that the white ones had and I saw
>         the leads that the black ones had, and they were like this far apart [gesturing].
>         They had nothing in common.

(Collins Dep. 47:16–48:2).  This testimony is better evidence of unlawful discrimination.  It is an

allegation concerning the quality of sales leads given to black employees versus those given to white

employees within the Training Department.  Collins also testified to a similar disparity in lead

quality with regard to gender:

> Q     Did you see any leads that Fairfield distributed that were given to men that
>         were not given to women?
>
> A     Yes.  As a matter of fact –
>
> Q     Let's keep going.

(*Id.* 56:9–11).  Although Collins was not able to specify which managers gave which better leads

to which persons or on which dates, a claim of race or gender discrimination need not be pled with

particularity.  If a jury credited her testimony, it could reasonably infer race discrimination by

Fairfield as a company and render a verdict based on this even in light of her inability to remember

particular details.  The evidence is weak because of its lack of specificity, but it is sufficient to

survive summary judgment.

Second, the deposition of Adero Fleming indicates that among some saleswomen, "[t]he one

that was black in color was the only one who never attended the training, was not given information

1    about the training from her team." (Fleming Dep. 12:19–21, Aug. 20, 2009).  This testimony could

2    support several inferences, one of which is that the African-American woman was perhaps offered

3    training (that Fleming doesn't know about) and just never showed up for it.  But another inference

4    it could support is purposeful race discrimination by Fairfield.

5         Taylor also provides the affidavits of Harry Shornberg, III and Rochel Collins, which are not

6    helpful.  Shornberg attests that there was no written sales policy of which he was aware, that all

7    salespersons in the Training Department had "terrible leads," and that a white woman was given

8    better sales leads than her coworkers (whose races and genders he does not identify). (#118, Ex. 2).

9    Collins attests that she worked in the Referral Department, that she regularly observed managers

10   harassing workers to the point that they quit, that she herself had been harshly criticized and forced

11   to remove personal items from her workspace, that "certain" salespersons received better leads than

12   others, and that some salespersons were bribing managers to get better leads. (#118, Ex. 3).  These

13   affidavits do not provide any evidence of race or gender discrimination.  The closest thing to a claim

14   of discrimination with respect to a protected class in these affidavits is Shornberg's claim that a

15   white woman received better sales leads than her coworkers, but there is no attestation to the races

16   or genders of these coworkers, or whether this woman was one of the people allegedly bribing the

17   managers for better leads, which could account for any disparity without reference to race.  The

18   affidavits tend only to show that Fairfield was an awful place for anyone to work.  The deposition

19   of Donald K. Winston is also not helpful in establishing race or gender discrimination. (*See*

20   *generally* Winston Dep., Aug. 20, 2009).  Winston testifies mainly to a lack of a written policy for

21   transfer from the Training Department to the Referral Department.  Winston substantiates that Scott

22   Dowling set a verbal policy requiring thirty-six sales over a three-week period, with a 70-80% self-

23   closing rate, although he does not indicate the policy on proration for unavailable work days in the

24   excerpt that Taylor has provided. (*Id.* 25:19–23).  Finally, Taylor's own affidavit contains

25   conclusory claims of race and gender discrimination against her. (#118, Ex. 7).

1    In conclusion, the direct evidence of unlawful discrimination Taylor provides in the

2    Response (#118) via the Collins deposition, although not particularly strong, is enough to show a

3    genuine issue of material fact as to her claims of race and gender discrimination.  A reasonable jury

4    could find for either Plaintiff or Defendant based on the evidence the parties have adduced.

5    Therefore, summary judgment is not appropriate on the Title VII race and gender discrimination

6    claims.

7              **2.      Retaliation**

8              The same burden-shifting regime applies in retaliation cases. *Hernandez v. Spacelabs*

9    *Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  "To establish a prima facie case for a retaliation

10   claim under Title VII, [a plaintiff] must show: (1) that he engaged in a protected activity, (2) that

11   he suffered an adverse employment action, and (3) that there is a causal link between the two."

12   *Hernandez*, 343 F.3d at 1113 (citing *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th

13   Cir.1994)).

14            Here, Plaintiff claims that she filed a complaint with the NERC on July 24, 2006, which she

15   amended on August 10, 2006, and that she was placed on suspension "on pretextual grounds"

16   immediately after Fairfield learned of this. (#77 ¶ 4).  There is no dispute that Taylor filed her

17   complaints on the dates she claims and that this is protected activity.  There is also no dispute that

18   Taylor was suspended on August 17, 2006.  But there is a dispute over causation, and Taylor

19   provides no evidence from which causation could even be inferred.  She makes conclusory claims

20   about pretext in the AC (*Id.*).  However, she claims no facts that indicate causation.  Even presuming

21   that Taylor had established a prima facie case, Fairfield would meet its shifted burden,[5] and Taylor

22   would not then meet hers.  None of the affidavits or depositions Plaintiff provides indicate that

23   _____

24            [5]Fairfield has presented evidence of Taylor's poor performance and its suspicion on

25   August 17, the day of her suspension, that she had attempted to steal confidential sales
     information.

1    Fairfield learned of the complaint before receiving a copy of the notice from the NERC, presumably

2    a few days after the date of August 18 listed on the notice, which is the day after Taylor was

3    suspended. (#107, Ex. M).

4          In *Hernandez*, the Ninth Circuit reversed a district court that ruled a Title VII claimant had

5    failed to make out the causation element of a prima facie case. 343 F.3d at 1113.  The Ninth Circuit

6    pointed out that the defendant company in that case had conceded that Hernandez's supervisor, Mr.

7    Pray, knew that Hernandez's allegations of harassment had been brought to the attention of Ms.

8    Lasher, the human resources manager, and that Lasher had confronted Pray with the allegations. *Id.*

9    at 1110, 1113.  The Ninth Circuit rejected the defendant's claim that Pray had no knowledge it was

10   Hernandez who had reported the alleged harassment, because it was conceded that Pray knew

11   someone had made a complaint, and Pray could have known or suspected it was Hernandez. *Id.* at

12   1113–14.  The court ruled that summary judgment was not appropriate under this fact pattern. *Id.*

13         Here, unlike in *Hernandez*, there is no evidence at all from which a reasonable jury could

14   infer causation.  There is no evidence, nor even a claim, that any managers at Fairfield knew of

15   Taylor's complaint to the NERC before her suspension.  And unlike in *Hernandez*, here there is no

16   claim that Plaintiff or anyone else made any internal complaint of discrimination to any Fairfield

17   personnel.  The only complaint in the present case was made externally, to NERC, and Plaintiff

18   provides no evidence at all that could lead to an inference that Fairfield knew of the external

19   complaint before they received notice from the NERC, sometime after August 18, 2006, which was

20   necessarily after Taylor's dismissal on August 17.  Plaintiff has positively admitted having no such

21   evidence. (Taylor Dep. 134:2–6).  This is fatal to her attempt to make out a prima facie case of

22   retaliation.

23         Taylor also claims, however, that her treatment in the Referral Department during her short-

24   lived return to Fairfield beginning on September 24, 2006, was motivated by her complaint to the

25   NERC.  There is no dispute that Fairfield knew of her complaint to the NERC by this time.

1    Although the bare fact that Fairfield knew of the complaint to the NERC before Taylor's return may

2    support a prima facie case, it does not prevent summary judgment.

3           First, the alleged poor treatment was not an adverse employment action.  Taylor claims the

4    treatment was "constructive discharge."   The Ninth Circuit "set[s] the bar high for a claim of

5    constructive discharge because federal antidiscrimination policies are better served when the

6    employee and employer attack discrimination within their existing employment relationship, rather

7    than when the employee walks away and then later litigates whether his employment situation was

8    intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (footnote omitted).

9    Constructive discharge occurs when "the working conditions deteriorate, as a result of

10   discrimination, to the point that they become sufficiently extraordinary and egregious to overcome

11   the normal motivation of a competent, diligent, and reasonable employee to remain on the job to

12   earn a livelihood and to serve his or her employer." *Id.* (quoting *Brooks v. City of San Mateo*, 229

13   F.3d 917, 930 (9th Cir. 2000)).

14          Taylor has not made out a case for constructive discharge.  She bases the claim on her

15   allegations that Fairfield created a hostile work environment[6] in that: (1) she received no additional

16   training upon returning after her suspension and being placed in the Referral Department; and (2)

17   that she was prevented from "learning any procedural routines from co-workers . . . ." (*Id.* ¶ 5).

18          As to the alleged lack of training, Fairfield responds that no training was needed because

19   sales representatives in the Referral Department sold the same types of vacation packages as those

20   in the former Training Department—in other words, it was the same job, but the employees were

21   no longer on probationary training status.  Fairfield notes that the previous months Plaintiff spent

22   selling vacation packages in the Training Department was in fact her training for the Referral

23   Department position, which was the entire purpose of having the separate departments.  No

24   ───────────────────

25          [6]As noted below, Taylor conflates a hostile work environment claim with constructive discharge.

1   additional training was necessary.  Fairfield also notes that Taylor admitted receiving an additional

2   "15 minutes" of training when she came back to work in the Referral Department in her second

3   amended charge to the NERC. (#107, Ex. Q).  But even if she had not received any additional

4   training, Plaintiff does not claim in the AC or her Response (#118) that any additional training was

5   routinely provided or appropriate.  She only claims that she did not receive any.  She also claims that

6   she was somehow prevented from learning "procedural routines," but she does not explain what

7   these were or why they were necessary to perform her job.  Nowhere does Taylor claim any actions

8   by Fairfield making work conditions "sufficiently extraordinary and egregious to overcome the

9   normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn

10  a livelihood and to serve his or her employer."

11       Taylor's own evidence indicates that poor treatment was par for the course at Fairfield.  As

12  Taylor points out, Collins's affidavit indicates that she "regularly observed situation[s] in which

13  managers created hostile work environments for individuals they wanted to force to quit." (#118 ¶

14  18 (quoting *id.*, Ex. 3)).  Collins goes on to indicate that she was the recipient of such treatment

15  herself. (*Id.*, Ex. 3).  Collins also claims that disparate treatment in the Referral Department was due

16  at least in part to a system of bribery. (*Id.*).  This only provides evidence that Fairfield's managers

17  were generally hostile or perhaps that they demanded bribes from people generally.  None of the

18  affidavits or depositions indicate any witnesses to Taylor's alleged abuse in the Referral Department

19  upon return, much less that such abuse was due to her complaint with the NERC.  Taylor provides

20  no evidence indicating that she was retaliated against because of her complaint, apart from the bare

21  timing of her complaint, return to work, and resignation.  Her own affidavit is devoid of facts

22  indicating constructive discharge after her return. (#118, Ex. 7).  She in fact admits that she resigned

23  because she *anticipated* discharge based on Fairfield's alleged discriminatory practices and apparent

24  disinclination to remedy them, not because her work conditions became so awful as a result of her

25  complaint that she could not function:

1  After I filed a complaint with the [NERC] and Fairfield failed to respond to
2  the action in any meaningful way, it became clear to me that I was facing either
   actual or constructive discharge if I remained at Fairfield.

3  Therefore, I left Fairfield's employment as a result of what I considered to
   be unequal and unfair treatment of employees and the poor quality and handling of
4  sales leads by the company and its managers.

5  (*Id.*).  This might serve as additional evidence of disparate treatment at Fairfield, but it does not

6  make out a claim of constructive discharge.

7  **3.     Hostile Work Environment**

8  "To make a prima facie case of a hostile work environment, a person must show 'that:

9  (1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was

10 unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the

11 victim's employment and create an abusive working environment.'" *Craig v. M&O Agencies, Inc.*,

12 496 F.3d 1047, 1055 (9th Cir. 2007) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th

13 Cir.1995) (internal quotations omitted)).  The elements of a claim based on race are the same, but

14 the verbal or physical conduct must be "based on her race." *Surell*, 518 F.3d at 1108.

15 Taylor claims Fairfield created a hostile work environment when she returned from

16 suspension, resulting in her "constructive discharge." (#77 ¶ 5–6).  She bases the hostile work

17 environment claim on her allegations that (1) she received no additional training upon returning after

18 her suspension and being placed in the Referral Department; and (2) that she was prevented from

19 "learning any procedural routines from co-workers . . . ." (*Id.* ¶ 5).

20 The hostile work environment claim fails to make out a prima facie case because Taylor

21 makes no claim that she was subjected to racist or sexist comments or physical behavior, such as

22 groping.  This is the nature of a hostile work environment claim.  The complaints Taylor makes

23 about her treatment in the Referral Department upon return to Fairfield are in substance claims of

24 disparate treatment and retaliation, which have already been addressed above.  Therefore, the Court

25 grants summary judgment on the hostile work environment claim.

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Motion for Summary Judgment (#107) is GRANTED

3    in part as to the retaliation and hostile work environment claims and DENIED in part as to the race

4    and gender discrimination claims.

5          DATED:          November 10, 2009

6

7                                        _____

8                                        Robert C. Jones
                                         United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25